UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ROBERT W CABELL,

        Plaintiff,

  v.

ZORRO PRODUCTIONS INC., et al.,

        Defendants.

Case No. 5:15-cv-00771-EJD

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 185, 195

      Plaintiff Robert W. Cabell ("Cabell" or "Plaintiff") brings this action for copyright infringement and related claims against Zorro Productions, Inc. ("ZPI") and ZPI's owner John Gertz (collectively, "Defendants"), in connection with a musical Plaintiff created based on the fictional character "Zorro."  Presently before the Court is Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 185) ("Plaintiff's Motion" or "Pl's Mot.") and Defendants' Cross-Motion for Partial Summary Judgment (Dkt. No. 195) ("Defendants' Cross-Motion" or "Defs' Cross-Mot.") under Federal Rule of Civil Procedure 56.

      The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338.  Having carefully considered the pleadings, the briefs submitted by the parties, and the parties' arguments at the hearing, Plaintiff's Motion will be GRANTED and Defendants' Cross-Motion will be GRANTED IN PART and DENIED IN PART for the reasons discussed below.

# I. BACKGROUND

## A. Factual Background

### i. The Curse of Capistrano

The fictional character of "Zorro" first debuted in 1919 in "The Curse of Capistrano" ("COC"), a serialized story by Johnston McCulley which was published in All-Story Weekly. Declaration of Robert Cabell ("Cabell Decl."), Dkt. No. 185-1, at ¶ 2; Declaration of John Gertz ("Gertz Decl."), Dkt. No. 195-10, at ¶ 3. In 1920, COC was adapted into a silent movie titled "The Mark of Zorro" by Douglas Fairbanks. *Id.* In 1922, McCulley published a sequel to COC entitled "The Further Adventures of Zorro," which also appeared as a serialized story in All-Story Weekly. Cabell Decl. ¶ 3. COC has also since been re-published as a novel entitled "The Mark of Zorro." Cabell Decl. ¶ 2. All of these works are in the public domain. Pl's Mot. 3.

COC takes place in early 19th Century Spanish California and tells the story of Don Diego de la Vega, a wealthy nobleman who has taken on the secret identity of Zorro. Cabell Decl. ¶ 4; Gertz Decl. ¶ 3. Zorro seeks to protect the poor and downtrodden from the corrupt administration of Governor Alvarado, Captain Juan Ramon, and Sergeant Pedro Gonzales. *Id.* He disguises himself by wearing a black cap, black sombrero, and black mask. *Id.* He rides a horse and fights with a whip and a sword. *Id.* His love interest is Lolita Pullido, who dislikes Diego but becomes enamored with Zorro. Gertz Decl. ¶ 3. When Lolita's family is incarcerated for treason, Zorro kills Captain Ramon in a swordfight, forces Governor Alvarado to abdicate, and then reveals his true identity as Diego to win Lolita's heart. *Id.*

### ii. ZPI

On July 26, 1949, McCulley assigned "the absolute exclusive and unqualified right, license and privilege throughout the world . . . to radio, motion picture, phonograph, records . . ., comic strips advertising, dramatic and television rights to the character 'Zorro,' throughout the world forever" to Mitchell Gertz, the father of defendant John Gertz. Gertz Decl. ¶ 5; Gertz Decl., Ex. C, Dkt. No. 195-11. ZPI has licensed its rights in Zorro to a number of Hollywood companies for

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

2

1    various Zorro-related works and paraphernalia.  Gertz. Decl. ¶ 6.  One of these was a musical

2    stage production entitled "Zorro, The Musical," which was written and directed by Ken Hill ("Hill

3    Musical").  Gertz Decl., Ex. F, Dkt. No. 195-11.  ZPI has not specifically identified the copyrights

4    and trademarks it owns which it believes are relevant to this litigation.[1]

5        ### iii.    The Cabell Musical and Copyrights

6        In 1996, Plaintiff published a musical entitled "Z - The Musical of Zorro" ("Cabell

7    Musical") based "expressly" on McCulley's 1919 story and Fairbanks' 1920 movie.  Pl's Mot. 3.

8    Zorro is portrayed in Plaintiff's musical as "a masked avenger leading a double life, donned in a

9    black mask, black sombrero, black cape, and with a sword and whip."  *Id*.  The musical was first

10   produced as a staged reading at the Lamb's Theatre in New York City in 1997, and was

11   subsequently released on audio cassette and then CD format.  Supplemental Declaration of Robert

12   Cabell ("Supp. Cabell Decl."), Dkt. No. 206-5, at ¶ 12.  A stage production by the Actors Cabaret

13   of Eugene ("ACE") premiered in Eugene, Oregon in 2000.  Cabell Decl. ¶ 8.

14       Plaintiff has registered various scripts and audio versions of the Cabell Musical with the

15   U.S. Copyright Office, and his copyright interest "extends only to the original, novel elements of

16   his work and do not include those elements present in any Zorro works that were in the public

17   domain as of 1996."  Second Amended Complaint ("SAC"), Dkt. No. 119, at ¶¶ 16-18.  Of the

18   copyrights Plaintiff owns, the following are at issue in this lawsuit: (1) Copyright No. PA 2-113-

19   089, which relates to the original script of the Cabell Musical from 1996; (2) Copyright No. PA 2-

20   171-672, which relates to a revised script of the Cabell Musical from 1997; (3) Copyright No. PA

21   2-2226-359, which relates to a further revised script of the Cabell Musical from later in 1997; and

22   (4) Copyright Nos. SR 389-305 and PA 10-000-842, which relate to 1998 recordings of the Cabell

23   Musical, after it was performed at Lamb's Theatre.  SAC ¶¶ 16-19, 70.

24

25   ─────────────

26   [1] Instead, ZPI states that it has, "[a]mong other things . . . licensed over 60 separate ZORRO stage
     productions and owns the federally registered mark ZORRO, Reg. No. 2,198,254, in connection
     with "entertainment in the nature of theater productions."  Defs' Cross-Mot. 4.

27   Case No.: 5:15-cv-00771-EJD
     ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
28   GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR
     PARTIAL SUMMARY JUDGMENT

In connection with this motion, the parties have submitted the following scripts of the "Cabell Musical:"

- **"'098 Deposit Copy"** (Declaration of David Aronoff ("Aronoff Decl."), Ex. 1, Dkt. No. 195-7): The deposit copy of PA 2-113-089.

- **"'672 Deposit Copy"** (Cabell Decl., Ex. D, Dkt. No. 148-5): The deposit copy of PA 2-171-672.

- **"1996 Cabell Script"** (Gertz Decl., Ex. I, Dkt. No. 195-12): The version of the Cabell Musical which Plaintiff provided to John Gertz in 1996. Supp. Cabell Decl. ¶ 11. Plaintiff claims this is "very similar" to the '098 Deposit Copy and "nearly identical" to the '672 Deposit Copy. *Id.*; Dkt. No. 215 at 3.

- **"1997 Cabell Script"** (Supp. Cabell Decl., Ex. 2, Dkt. No. 206-7): The version of the Cabell Musical that was read in 1997 at the Lamb's Theatre. Supp. Cabell. Decl. ¶ 12. Cabell claims this is "very similar" to the deposit copy of PA 2-2226-359.[2] Supp. Cabell Decl. ¶ 12.

- **"2000/ACE Cabell Script"** (Dkt. No. 185-1 at 8-143): The version of the Cabell Musical that was performed in 2000 by ACE. Supp. Cabell Decl. ¶ 13. Cabell claims this is "very similar" to the '672 Deposit Copy.[3] *Id.*

The parties have not submitted deposit copies for Copyright Nos. PA 2-2226-359, SR 389-305, and PA 10-000-842. Defendants report that they attempted to locate the deposit copy for Copyright No. PA 2-2226-359, but were informed by the Copyright Office that "unfortunately, it appears that the work . . . has been misplaced at our storage facility." Aronoff Decl., Dkt. No.

---

[2] In his supplemental briefing, Plaintiff states in an unsworn footnote that this is a "duplicate copy" of the work he registered. Dkt. No. 215 at 1 n.1.

[3] In his supplemental briefing, Plaintiff identified that, on February 22, 2018, he submitted a copyright application for the "2000/ACE Cabell Script," Dkt. No. 185-1 at 8-143, which has been assigned Copyright Case No. 1-6312495651. However, Plaintiff has not asserted this copyright interest in this litigation. *See* SAC ¶ 70; *cf.* 17 U.S.C. § 411(a) ("No action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title."); 3 Nimmer on Copyright § 12.08; 2 Nimmer on Copyright § 7.16[B].

195-6, at ¶ 3.

### iv.    Plaintiff and ZPI

In 1996, Plaintiff met with Gertz about producing the Cabell Musical, during which time Plaintiff provided Gertz with a copy of the 1996 Cabell Script. Supp. Cabell Decl. ¶ 11; Gertz Decl. ¶ 9 and Ex. H, Dkt. No. 195-12. However, the conversations ultimately broke down. On April 1, 1997, Plaintiff sent Gertz a letter informing him that "[t]hough I appreciate your past support it seems in actuality, the only thing you are able to license to me is the Zorro logo, which I have absolutely no interest in . . . . You must understand that I will continue this project under the rights of public domain . . . ." Gertz Decl. ¶ 11 and Ex. J, Dkt. No. 195-12. That same day, Gertz replied "I understand clearly that you have decided that my company's rights are unnecessary for your project, and that you intend to proceed without our rights . . . . [S]ince you seem determined to proceed onwards, I will simply inform you of the obvious: any attempt to produce your play before a paying audience will result in an immediate law suit." Gertz Decl. ¶ 12 and Ex. K, Dkt. No. 195-12. At that point, Plaintiff alleges that ZPI began, for the first time, aggressively asserting that Plaintiff's script infringed ZPI's copyrights and trademarks, and insisting that Plaintiff acquire a license from ZPI to produce it. SAC ¶ 38.

Plaintiff then proceeded to work on the commercial release of his musical without a license from Defendants. In the early 2000s, he engaged an agency and a choreographer/producer in anticipation of a Broadway production. Id. ¶ 39. However, according to Plaintiff, the Broadway production never materialized due to threats from Defendants. Id. ¶ 40. Plaintiff also alleged in his SAC that, after the Cabell Musical was commercially released, Defendants harassed and threatened litigation against other vendors of his work, and actively discouraged third parties from producing the musical in the United States, London, Brazil, Japan, Germany, and Belgium. Id.

In response to Defendants' alleged interference and threats of litigation, Plaintiff filed a Petition for Cancellation of ZPI's registered trademarks in the United States Patent and Trademark Office in 2002. Id. ¶¶ 35-36, 43. However, in 2004, Plaintiff voluntarily withdrew the Petition

United States District Court
Northern District of California

without prejudice as part of a "walk-away agreement" negotiated by Sony Pictures out of concern for the dispute's impact on the release of its upcoming film, "Legend of Zorro." *Id.* ¶ 36. As part of the deal, Plaintiff agreed to withdraw his cancellation petition, and ZPI agreed not to challenge Plaintiff's Zorro-related copyrights and trademarks. *Id.*

### v. ZPI Works

On or about November 19, 2003, ZPI entered into a written license agreement with Isabelle Allende authorizing her to use McCulley's characters, including Zorro and Don Diego, to write a full-length book telling the story of "Young Zorro" based on a summary written by Allende. Gertz Decl. ¶ 14 and Ex. N, Dkt. No. 195-13. Allende's novel, titled "Zorro, A Novel," (the "Allende Novel") was published in 2005. Gertz Decl., Ex. O ("Allende Novel"), Dkt. No. 195-13. According to Allende, the Allende Novel was "her own original story" and "[n]one of the expressive content of the [Allende] Novel was created by any third party, including ZPI and Mr. Gertz. It is all my original expression." Declaration of Isabel Allende ("Allende Decl."), Dkt. No. 195-1, at ¶ 3. She also maintains that she has "never heard of Mr. Cabell or the Cabell Musical until after this litigation was filed" and "at no time did [she] have access to any version of the Cabell Musical or any songs scripts, or other materials pertaining to Mr. Cabell or his musical." *Id.* ¶ 4.

On or about January 1, 2005, ZPI entered into an agreement with Zorro London Limited ("ZLL")[4] for the development and production of a musical based on Zorro (the "ZPI Musical"). Gertz Decl. ¶ 15 and Ex. P, Dkt. Nos. 195-15 and 195-16. Christopher Renshaw, the director of the ZPI Musical, attests that he was "integrally involved in all steps of the development of the book (i.e., the script) and the lyrics of the musical in shoulder-to-shoulder collaboration with Stephen Clark who, is credited for writing both the book and lyrics, and Helen Edmundson, who is credited for co-writing the book of the ZPI Musical. Unfortunately, Mr. Clark passed away in

---

[4] ZLL is a limited liability company based in London that is not a party to this litigation. Gertz Decl. ¶ 15.

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

2016." Declaration of Christopher Renshaw ("Renshaw Decl."), Dkt. No. 195-3, at ¶ 3. Renshaw also states that he has "never heard of Mr. Cabell or the Cabell Musical until after this litigation was filed" and "at no time did [she] have access to any version of the Cabell Musical or any songs scripts, or other materials pertaining to Mr. Cabell or his musical." *Id*. ¶ 5.

The ZPI Musical premiered in 2008 and has been performed in various United States jurisdictions including Atlanta, Georgia and Salt Lake City, Utah. Gertz Decl. ¶ 18. It has also been performed internationally. *Id*. According to Gertz, he has invested over $30 million worldwide to produce the ZPI Musical. *Id*.

Over the years, the ZPI Musical has gone through multiple revisions, embodied in different scripts. The following are relevant here:

- **"2005 AKA Script"** (Cabell Decl., Ex. 3, Dkt. No. 206-8): A version of the musical which was commissioned by AKA Productions, not ZPI. Supplemental Declaration of John Gertz ("Supp. Gertz. Decl.") Dkt. No. 210-2, at ¶ 3; Defs' Reply at 4 n.9, Dkt. No. 210. According to Gertz, this is a draft which was written three years before the public debut of the ZPI Musical. Supp. Gertz. Decl. ¶ 5. It was never performed or released to the public. *Id*. ¶ 4.

- **"2008 ZLL Script"** (Gertz Decl., Ex. Q, Dkt. No. 196-16): The final version of the ZPI musical which was performed in 2008 in London. Gertz Decl. ¶ 15, Dkt. No. 195-10.

- **"2012 ZLL Script"** (Cabell Decl., Ex. 4, Dkt. No. 206-9): The final version of the script which was performed in 2012 at Hale Centre Theatre in West Valley, Utah.

- **"2013 ZLL Script"** (Cabell Decl., Ex. 5, Dkt. No. 206-10): The final version of the script which was performed in 2013 in Atlanta.

### vi. German Production Efforts and Litigation

While ZPI made efforts to produce and promote its musical, Plaintiff made efforts to do the same. He retained Gallissas Theaterverlag und Mediaagentur GmbH ("Gallissas") to serve as his international broker and agent. Cabell Decl. ¶ 10. In early 2013, Gallissas licensed the Cabell

Musical to affiliates in Germany so that it could be performed in Clingenberg and Villa Fuchs, Germany. *Id.* ¶ 11. Before the musicals were produced, ZPI initiated preliminary injunction proceedings against both theatres, alleging infringement of ZPI's German copyrights and trademarks in the Zorro story and character. *Id.* ¶ 12; Declaration of Bernhard Buchner ("Buchner Decl."), Dkt. No. 195-8, at ¶¶ 3-5. In the Clingenburg case, the regional court set an oral hearing for May 22, 2013, at which time the parties entered into a settlement. Buchner Decl. ¶¶ 3-5. The court in the Villa Fuchs case conducted an oral hearing on May 15, 2013, and later denied a preliminary injunction on the grounds that ZPI's moving papers had not sufficiently proved ZPI's rights in ZORRO. *Id.* Subsequently, Plaintiff filed an independent action against ZPI for declaratory relief, and ZPI counterclaimed for infringement. *Id.* ¶ 7. Those actions are still pending. *Id.*

Meanwhile, Gallissas' rights to license the Cabell Musical have expired. On June 24, 2014, Plaintiff "rescinded the worldwide rights granted to Gallissas" in a "Second Amendment" to his contract with Gallissas. Aronoff Decl., Ex. 4, Dkt. No. 195-7, at ¶ 23.

### vii. Recent Production Efforts in the United States

In addition to the German production efforts, Plaintiff contends that he has recently made efforts to produce his play commercially in the United States. In particular, he has engaged with the director/producer Rick Sordalet, who "ha[s] continued to follow and support Mr. Cabell's efforts to produce his musical . . . and ha[s] always desired to produce Mr. Cabell's musical." Declaration of Rick Sordalet ("Sordalet Decl."), Dkt. No. 185-2, at ¶ 9. In 2013, Sordalet went to work on lining up productions of the Cabell Musical at The 5th Avenue Theatre in Seattle, Washington and The Philadelphia Shakespeare Theatre in Philadelphia, Pennsylvania. *Id.* ¶¶ 12-13. However, according to Sordalet, while these discussions were taking place, "John Gertz made it clear to Mr. Cabell and his agent, Gallissas, that despite the rulings in Germany, he would continue to sue any theatre that produced Mr. Cabell's musical." *Id.* ¶ 14. "As a result of these continued threats, Gallissas refused to license Mr. Cabell's musical. Since the 5th Avenue Theatre

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

and Pennsylvania Shakespeare Festival could not obtain a license, all discussions and negotiations with those theatres ceased." *Id*. ¶ 15.

### B.   Procedural Background

On March 13, 2013, Plaintiff filed a Complaint against ZPI, Gertz, and Stage Entertainment Licensed Productions  in the United States District Court for the Western District of Washington.   Dkt. No. 1.  Plaintiff filed a First Amended Complaint ("FAC") on April 8, 2013, and Defendants moved to dismiss the FAC on May 16, 2013, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), and under the doctrine of forum non conveniens.  Dkt. Nos. 8, 20.   After Plaintiff conducted early discovery on personal jurisdiction, the district court in Washington granted the 12(b)(2) motion and dismissed the action with respect to ZPI and Gertz. Dkt. Nos. 71, 72.  In response, Plaintiff moved the court to reconsider the dismissal in favor of transfer.  Dkt. Nos. 73.  The court did so, reinstated the claims against ZPI and Gertz, and transferred the action to this Court.  Dkt. No. 84.

On April 14, 2015, after the case was transferred to this district, Defendants again moved to dismiss on grounds of forum non conveniens and for failure to state a claim under Rule 12(b)(6).  Dkt. No. 101.  Plaintiff then filed a Motion for Leave to File Second Amended and Supplemental Complaint, which the Court granted on September 23, 2016.  Dkt. Nos. 105, 118. Accordingly, the Court also denied without prejudice Defendants' first Motion to Dismiss.  *Id.*

On September 26, 2016, Plaintiff filed his SAC, asserting the following claims: (1) copyright infringement, (2) declaratory judgment of non-infringement, (3) cancellation of federal trademark registration; (4) tortious interference with contract and business expectancy; (5) common law fraud; and (6) unfair competition and unfair trade practices in violation of California Business and Professions Code § 17200.  SAC ¶¶ 69-99.  Plaintiff also sought a preliminary and permanent injunction against Defendants prohibiting them from making claims that Plaintiff's musical infringes upon any of Defendants' intellectual property rights.  *Id*. at 20, ¶ G.  On October 14, 2016, Defendants moved to dismiss the SAC under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). Dkt. No. 120. On May 30, 2017, the Court issued an order granting Defendants' motion with respect to Plaintiff's third, fourth,[5] and fifth cause of action and denying it with respect to the remainder. Dkt. No. 154.

Meanwhile, on April 4, 2017, Plaintiff moved for partial summary judgment on his second cause of action, seeking a declaration that he did not infringe Defendant's copyrights. Dkt. No. 138. However, because no discovery on the merits had been conducted prior to this filing, *see* Dkt. Nos. 139, 146, 152, the Court denied Plaintiff's motion without prejudice. Dkt. No. 176.

On October 25, 2017, Plaintiff again moved for summary judgment on his second cause of action, again seeking a declaration that he did not infringe Defendant's copyrights. Dkt. No. 185. On November 22, 2017, Defendant filed an opposition and cross-motion for summary judgment on Plaintiff's first and second causes of action, seeking dismissal of Plaintiff's first claim for copyright infringement and Plaintiff's second claim for declaratory judgment of non-infringement. Dkt. No. 195. The Court held a hearing on the parties' motions on February 15, 2018. Dkt. No. 212. However, because neither party's briefing sufficiently provided the Court with the information it needed to reach a determination, the Court requested supplemental briefing. Dkt. No. 213. The parties submitted supplemental briefs in February and March, 2018.[6] Dkt. Nos. 215, 216, 223, 224. After supplemental briefing was concluded, Plaintiff filed a motion for leave to file a further supplemental brief, Dkt. No. 226, which Defendants opposed, Dkt. No. 227. Defendants then filed their own motion for leave to file a further supplemental brief, Dkt. No. 229.

---

[5] Specifically, for Plaintiff's Fourth Cause of Action for Tortious Interference with Contract and Business Expectancy, the Court granted Defendants' motion to the extent it was based on Defendants' alleged interference with Cabell's third-party negotiations and prospective business opportunities, but denied it without prejudice with respect to Defendants' alleged interference with Gallissas. Dkt. No. 154.

[6] The Court notes that, despite its request for *additional* information, including a chart of *all* of the allegedly protectable elements of the Cabell Musical and whether or not they infringe, Plaintiff's comparison chart in its supplemental briefing is—disappointingly—mostly a repetition of the comparison chart which Plaintiff submitted in connection with his Reply/Opposition. *Compare* Dkt. No. 206-6, *with* Dkt. No. 215-2.

## II. LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. *Id*. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); *Celotex Corp*., 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).

The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. *Id*. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Thornhill Publ'g Co. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire & Marine*

*Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id*.

## III. DISCUSSION

Plaintiff moves for partial summary judgment with respect to the second claim in the SAC, seeking a declaration that the Cabell Musical does not infringe Defendants' copyrights. Pl's Mot. Defendants oppose Plaintiff's Motion and cross-move for partial summary judgment with respect to the first and second claims in the SAC, seeking dismissal of both. Defs' Cross-Mot. The Court addresses each claim in turn.

### A. First Claim: Copyright Infringement by Defendants

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991). Here, the parties do not appear to dispute that Plaintiff owns multiple copyright registrations for his script and related audio recordings. *See* Defs' Cross-Mot 14-19; Pl's Opp/Reply 9-15. They do, however, dispute copying.

Where, as here, there is no direct evidence of copying, copying can be proven circumstantially by showing a defendant had "access" to a plaintiff's copyrighted material and that the two works at issue are "substantially similar." *See Funky Films, Inc. v. Time Warner Entertainment Co., L.P*., 462 F.3d 1072, 1076 (9th Cir. 2006); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000). "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." *Three Boys*, 212 F.3d at 486. "Even without proof of access, a plaintiff can still prove copying if he can show that the two works are not only substantially similar, but are so strikingly similar as to preclude the possibility of independent creation." *Meta-Film Assocs., Inc. v. MCA, Inc*., 586 F. Supp. 1346, 1355 (C.D. Cal. 1984) (citing 3 Nimmer on Copyright § 13.01[B] and *Ferguson v. National Broadcasting*

*Company, Inc.*, 584 F.2d 111, 113 (5th Cir.1978)). "Thus, whether or not a plaintiff proves access determines the degree of similarity that he must demonstrate between the two works." *Id.*

Here, Plaintiff contends that the ZPI Musical and Allende Novel (collectively, the "Accused Works") copied the Cabell Musical,[7] thereby infringing the copyrights he holds in his various scripts and audio recordings.[8] The Court first addresses the issue of access, and then turns to issues of similarity.

### i. Access

Access is proven when the plaintiff shows that the defendant had an "opportunity to view or to copy" the plaintiff's work. *See Sid & Marty Krofft Television Productions, Inc.*, 562 F.2d at 1172. In order to satisfy this standard, a plaintiff must show that the defendant had a "reasonable possibility" to view the plaintiff's work. *See* 3 Nimmer on Copyright § 13.02[A] n.5. "Of course, reasonable opportunity . . . does not encompass any bare possibility in the sense that anything is possible. Access may not be inferred through mere speculation or conjecture." *Three Boys*, 212 F.3d at 482 (quoting 4 Nimmer on Copyright, § 1302[A] ). "Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work . . . , or (2) the plaintiff's work has been widely disseminated." *Id.* (citations omitted); *see Stewart*, 574 F. Supp. 2d at 1085 (same).

Here, the parties do not dispute that, in 1996, Cabell provided Gertz with a copy of the 1996 Cabell Script. Gertz Decl. ¶ 10, Dkt. No. 195-10. Defendants also concede, for the purposes

---

[7] Different versions of Plaintiff's scripts and recordings are registered separately and each constitute separate copyrighted works. (Plaintiff does not claim copyright in one *combination* of all of these versions and recordings.) Therefore, each work is only entitled to protection of the original expression in that particular work, and each work must be judged against any allegedly infringing work on its own. Nevertheless, because the various versions of the Cabell Musical which the parties have submitted are similar, the Court will analyze them all at once and refer to them generally as the "Cabell Musical." This does not, however, mean that the Court considers all of the scripts and recordings as one whole.

[8] Plaintiff does not assert a separate claim of copyright infringement as to individual songs contained in the Cabell Musical. Pl's Opp/Reply 13 n.9.

of this motion only, that Gertz had access to the 2000/ACE Cabell Script.[9]  Defs' Reply 12.  The parties do not identify or provide evidence of any other instances where Plaintiff directly provided his works to anyone related to ZPI.  *See* Pl's Reply at 3-4.  Plaintiff also does not contend that his works were "widely disseminated."  *See id*.

From these undisputed facts, the Court can draw two initial conclusions: First, the parties have not submitted any evidence of access for works related to Copyright Nos. PA 2-2226-359, SR 389-305, and PA 10-000-842.  By Plaintiff's own admission, the only works for which there is evidence of access (the 1996 Cabell Script and the 2000/ACE Cabell Script) at most relate to Copyright Nos. PA 2-113-089 and PA 2-171-672.[10]  *See* Supp. Cabell Decl. ¶ 11 (claiming that the 1996 Cabell Script is "very similar" to the '098 Deposit Copy), ¶ 13 (claiming that the 2000/ACE Cabell Script is "very similar" to the '672 Deposit Copy; Dkt. No. 215 at 3 (arguing that the 1996 Cabell Script is "nearly identical" to '098 Deposit Copy).  Thus, the only way that Plaintiff can prevail in his infringement claims for Copyright Nos. PA 2-2226-359, SR 389-305, and PA 10-000-842 is by showing that the Cabell Musical is "strikingly similar" to the Accused Works.  *See* 3 Nimmer on Copyright § 13.01[B].

Second, even for Copyright Nos. PA 2-113-089 and PA 2-171-672, there is no evidence that any of the authors of the Accused Works—Isabel Allende (the author of the Allende Novel), Helen Edmundson (co-writer of the ZPI Musical), Stephen Clark (co-writer and co-composer of the ZPI Musical), John Cameron (co-composer of the ZPI Musical), the Gypsy Kings (co-

---

[9] There may, however, be a factual dispute on this issue: Cabell states in his declaration that in 2003 he provided John Gertz's legal counsel with a copy of the 2000/ACE Cabell Script.  Cabell Decl. ¶ 9.  Gertz states that neither he nor ZPI have records of having received this script.  Gertz Decl. ¶ 10.

[10] The Court also notes that, because the 1996 Cabell Script and the 2000/ACE Cabell Script are not themselves the works registered as Copyright Nos. PA 2-113-089 and PA 2-171-672, there is also some doubt as to whether Plaintiff will be able to prove at trial that there was any access to these works.  However, because Plaintiff at least makes the argument that these scripts are similar and it appears to the Court that a reasonable juror could agree (*see* Dkt. Nos. 148-5, 185-1 at 8-143, 195-7, 195-12), the Court will not conclude at summary judgment that there is no evidence of access to the works registered as Copyright Nos. PA 2-113-089 and PA 2-171-67.

composers of the ZPI Musical), and Christopher Renshaw (director of the ZPI Musical)—had direct access to the Cabell Musical. Instead, the only way any of these authors could have had "access" was through "a particular chain of events" that began with Gertz. *Three Boys*, 212 F.3d at 482.

In copyright law, a reasonable possibility of access can be established through a third-party intermediary if the nexus between the defendant and the individual possessing knowledge of plaintiff's work is sufficiently strong. *Meta Film*, 586 F. Supp. at 1355. The nexus is sufficiently strong to demonstrate a reasonable possibility of access when the third-party intermediary, "the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, either was a supervisor with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work." *Id*. At a minimum, establishing a reasonable possibility of access through a third-party intermediary requires that "the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access." *Meta Film*, 586 F. Supp. at 1358.

Here, there is no material dispute that Gertz, as President and CEO of ZPI, the company that entered into a licensing arrangement with the authors of the infringing works, had some kind of supervisory authority over their creation. Gertz Decl., at ¶¶ 14 and 15, Exs. N and P. However, this, in and of itself, is not enough. Instead, there must be evidence that there was "some overlap in subject matter" in his dealings with the authors. The Court next reviews the record evidence with respect to each of the Accused Works in turn.

With respect to the Allende Novel, Plaintiff refers to excerpts from Isabel Allende's deposition, where she discussed meetings that she had with John Gertz and Sandy Curtis. Dkt. No. 223 at 2. On its face, this evidence seems insubstantial—although she had meetings with Gertz, Allende consistently testified that she worked independently. *See, e.g.*, Dkt. No. 223-1, at 24:10-12 (explaining that "I don't want to write with anybody watching over my shoulder, that I

need total independence"); 29:5-17 (testifying that she declined to "work with a team" and instead wrote the story line on her own); 40:5-9 (stating that ZPI "respected very carefully what we had agreed, that I would write the book without them watching over my shoulder. And I defend that space very fiercely."). Nevertheless, at the same time, this evidence does not completely preclude the possibility that Allende also had exchanges with Gertz which could have given her access to the substance of Plaintiff's works. For example, Allende testified that at one point during a meeting with Gertz "the idea of writing how [Don Diego] becomes Zorro was expressed" and she did not "remember who proposed it." *Id*. at 24:17-19. Accordingly, construed in the light most favorable to Plaintiff, there is at least a triable issue of fact as to whether Allende had access to Plaintiff's works.

With respect to the ZPI Musical, Plaintiff refers to a series of Production Notes between Gertz and its authors (Pl's Opp/Reply, Ex. 2, Dkt. No. 206-2) and argues that this is evidence that "Gertz actively participated in organized meetings with all the authors [and] offer[ed] direction on character development, plot structure, and storyline." Reply 12, Dkt. No. 206. This evidence seems stronger than the Allende deposition, but it is still superficial. Plaintiff only identifies a couple of instances within these production notes where there is potential overlap in subject matter, Dkt. No. 215 at 4-5, and it is not clear that Gertz was the one who introduced this subject matter in the meetings. Nevertheless, construing this evidence in the light most favorable to Plaintiff, it is at least possible that a reasonable juror could conclude that there was sufficient overlap such that the authors gained access to Plaintiff's works. For example, during these meetings, Gertz and the authors discussed the character of Maria and certain plot elements (e.g., young Diego's learning magic and sword fighting, growing up in California but travelling to Spain, and using Gypsies as shadow characters) which Plaintiff contends are "substantially similar" to his copyrighted works. Dkt. No. 215 at 4-5 (citing Pl's Opp/Reply, Ex. 2, Dkt. No. 206-2, at 2, 5, 7, 9). Accordingly, a triable question of fact remains as to whether the authors of the ZPI Musical had access to Plaintiff's works.

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

In sum, taking the facts in the light most favorable to Plaintiff, the Court finds that there are genuine issues of material fact as to whether Defendants had access to the 1996 Cabell Script and the 2000/ACE Cabell Script. Plaintiff has not met his burden to show that there are any factual disputes as to whether Defendants had access to any of the other variants of the Cabell Musical, however.

### ii. Comparison

With these observations in mind, the Court turns to comparing the Accused Works with the Cabell Musical. Because there are only triable questions of fact as to access for the 1996 Cabell Script and the 2000/ACE Cabell Script—which at most relate to Copyright Nos. PA 2-113-089 and PA 2-171-672—the Court need only consider substantial similarity for those two works. In addition, because, as noted above, the evidence of access that Plaintiff points to in his briefing is relatively superficial, Plaintiff will, at least for the purposes of this motion, need to show a higher degree of similarity in order to prove copying. *Meta Film*, 586 F. Supp. at 1358 ("whether or not a plaintiff proves access determines the degree of similarity that he must demonstrate between the two works."). As to the remaining works—where the parties present no evidence of access—Plaintiff will need to show striking similarity in order to prove copying. *See* 3 Nimmer on Copyright § 13.01[B].

The Court begins with substantial similarity, assessing each of the Accused Works in turn, and then turns to striking similarity.

### a. Substantial Similarity (PA 2-113-089 and PA 2-171-672)

"The Ninth Circuit employs a two-part test for determining whether one work is substantially similar to another." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990) (citation omitted). Under this approach, a plaintiff must establish "substantial similarity of general ideas under the 'extrinsic test' and substantial similarity of the protectable expression of those ideas under the 'intrinsic test.'" *Id*.

The "extrinsic test is an objective comparison of specific expressive elements" of the

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

works, and focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Id.* (quoting *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)); *see also Funky Films*, 462 F.3d at 1077. "Familiar stock scenes and themes that are staples of literature are not protected." *Cavalier*, 297 F.3d at 823. Likewise, "[s]cenes-à-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* "Therefore, when applying the extrinsic test, a court must filter out and disregard the non-protectable elements in making its substantial similarity determination." *Id.* at 822-23; *Shaw*, 919 F.2d at 1361 (applying the extrinsic test to determine "whether there is substantial similarity between the protected expression of ideas in two literary works"); *Berkic v. Crichton*, 761 F.2d 1289, 1293–94 (9th Cir.1985) (rejecting consideration of general ideas as well as scènes-à-faire in determining substantial similarity under the extrinsic test).

The "intrinsic test" is a subjective comparison that is left to the trier of fact and focuses on "whether the ordinary, reasonable audience" would find the "total concept and feel of the works" to be substantially similar. *Wild v. NBC Universal, Inc.*, 788 F. Supp. 2d 1083, 1098 (C.D. Cal. 2011), aff'd sub nom. *Wild v. NBC Universal*, 513 F. App'x 640 (9th Cir. 2013) (citing *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010)).

"For summary judgment, only the extrinsic test is important." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). "Summary judgment on the issue of substantial similarity is appropriate 'if no reasonable juror could find substantial similarity of ideas and expression.'" *Funky Films*, 462 F.3d at 1077 (quoting *Kouf*, 16 F.3d at 1045). In general, "summary judgment is not highly favored on the substantial similarity issue in copyright cases." *Funky Films*, 462 F.3d at 1076 (citation omitted).

Before turning to the issues of similarity, the Court clarifies the scope of comparison. First, as both parties agree, the following works are in the public domain: Johnston McCulley, "The Curse of Capistrano" (1919) ("COC") (Gertz Decl., Ex. A, Dkt. No. 195-11); Douglas

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Fairbanks, "The Mark of Zorro" (1920) ("Fairbanks Film"), (Gertz Decl., Ex. B, Dkt. No. 195-

2   11); Johnston McCulley, "The Further Adventures of Zorro" (1922) , (Dkt. No. 138-1); Johnston

3   McCulley, "The Mark of Zorro" Novel, (Dkt. No. 138-1) (collectively, the "Public Domain

4   Works").  Thus, to the extent that Plaintiff's works contain elements that also appear in the Public

5   Domain Works, he cannot use that as a basis for claiming substantial similarity.  Second, as

6   discussed above, there are only triable questions of fact as to whether Defendants had access to the

7   1996 Cabell Script and the 2000/ACE Cabell Script; thus, Plaintiff can only prove copying

8   circumstantially by showing access and substantial similarity for those two scripts.  Third, as

9   discussed above, Plaintiff claims that both the Allende Novel and the ZPI Musical infringe his

10  copyrights.  As evidence, Plaintiff relies on four different scripts of the ZPI Musical—the 2005

11  AKA Script, the 2008 ZLL Script, 2012 ZLL Script, and 2013 ZLL Script.  However, only the last

12  three were publicly performed; thus, the Court will limit its analysis for the ZPI Musical to only

13  those scripts.

14          With these parameters in mind, the Court turns to the question of substantial similarity,

15  addressing each of the Accused Works in turn.

16                          **1.  Allende Novel**

17          Defendants contend that many of the constituent elements of the Cabell Musical mirror the

18  Public Domain Works and are not protected.  Cross-Mot. 23-24.  Defendants also contend that, to

19  the extent the Cabell Musical does contain protected elements, they differ vastly from the Allende

20  Novel.  *Id*.  Plaintiff disagrees on both accounts.  After reviewing the Cabell Musical and the

21  Allende Novel, the Court agrees with Defendants.

22          First, the plot of the Allende Novel is markedly different from the Cabell Musical.  The

23  Allende Novel is largely a fictional biography of Don Diego's childhood.  It begins with his

24  parents, telling the story of how his father, a Spanish soldier, first met his mother, an Indian

25  warrior, and eventually came to marry her.  *See* Allende Novel 5-25.  It then follows Diego as a

26  young boy, detailing his childhood friendship with Bernardo, the Indian training that the two

27  Case No.: 5:15-cv-00771-EJD
    ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
28  GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR
    PARTIAL SUMMARY JUDGMENT

received, and how Bernardo became mute after buccaneers rape and murder his mother. *See* Allende Novel 30-90. The story then shifts to Spain, where the boys perform with a gypsy troupe, train in the covert society La Jusitica, and befriend two girls, Juliana, Diego's love interest, and Isabel, her tomboyish sister. *See* Allende Novel 91-238. It then recounts how the group returned to the New World, with intermediate stops in places such as Cuba and New Orleans. *See* Allende Novel 238-319. Finally, the book ends with Diego's return to California, where he finds his father in prison and his land confiscated. *See* Allende Novel 320-84. Diego clears his father's name and dons the mask of Zorro to seek justice for those who cannot fight for themselves. *Id.*

Much of this detail is absent from the Cabell Musical. For example, 1996 Cabell Script begins with a grown-up Don Diego, who has already established his double-life as Zorro. *See* Dkt. No. 195-12. In addition, the 2000/ACE Cabell Script spends only the first 10 of its 124 pages on the life of young Zorro, and it is limited to sketches of (1) young Diego playing with young Carlotta and (2) young Diego training with his grandfather. Dkt. No. 185-1. This is far from substantial similarity. Nevertheless, in his supplemental briefing, Plaintiff identifies several discrete plot elements which he contends are similar, including: (1) Diego getting sent to Spain and learning magic from an older Spanish man; (2) a grandparent teaching Diego magic; (3) a mystical stone/sword; and (4) Diego getting involved with a tribe of gypsies. Dkt. No. 215-2 at 4. While there may be some rough and/or isolated similarities here, this is not enough to counteract the bulk of the Allende Novel's plot, which is new and different from the Cabell Musical. In addition, at least the element of gypsies is not original to the Cabell Musical, at they were also featured in the Hill Musical. *See* Gertz Decl., Ex. F. Accordingly, no reasonable juror could find that the plots are substantially similar.

Second, the characters of the Allende Novel are different from the Cabell Musical. In his supplemental briefing, Plaintiff identifies only three characters from the 1996 Cabell Script or the 2000/ACE Cabell Script which he contends are protectable: Maria, Young Diego and Young Carlotta, and Endara Montero. Dkt. No. 215-2 at 1-2. However, none of these characters are

substantially similar to characters in the Allende Novel. In the Cabell Musical, Maria is a voluptuous innkeeper in California; in the Allende Novel, Amalia—the character who Plaintiff claims is an analog—is a mature gypsy woman who Diego met in Spain. *Compare, e.g.*, 1996 Cabell Script 8-9, *with* Allende Novel 151. In the Cabell Musical, Endara Montero is Diego's grandmother and barely featured; in the Allende Novel, Toypurnia is Diego's mother and plays a more prominent role. *Compare, e.g.*, 2000/ACE Cabell Script 5-9, *with* Allende Novel 5-25. In the Cabell Musical, Young Diego and Young Carlotta appear briefly in a swordfighting scene in California; in the Allende Novel, a younger Diego has two young female companions (Juliana and Isabel), who he meets in Spain. *Compare, e.g.*, 2000/ACE Cabell Script 3-4, *with* Allende Novel 113-14. Accordingly, no reasonable juror could find that these characters are substantially similar.

Third, the setting of the Allende Novel is different from the Cabell Musical. As discussed above, the Allende Novel largely focuses on Diego's childhood, and contains scenes in Spain, Cuba, and New Orleans, as well as in California. By contrast, the Cabell Musical takes place almost exclusively in California. In addition, these California-based settings also largely parallel the settings in the Public Domain Works and, as such, are not protectable. Accordingly, no reasonable juror could find that the settings are substantially similar.

Fourth, the themes of the Allende Novel and the Cabell Musical are different. The Allende Novel, by its own account, is "[a] swashbuckling adventure story that reveals for the first time how Diego de la Vega became the masked man we all know so well." Allende Novel, Cover. Its theme is largely one of coming of age, aimed at telling the internal evolution of Diego's character. In contrast, the Cabell Musical focuses much more on Zorro the hero and has a more of a "good conquers evil" theme. In addition, in this sense, its theme is similar to the themes of the Public Domain Works and, as such, is not protectable. Accordingly, no reasonable juror could find that the themes are substantially similar.

Fifth, there is no substantial similarity among dialogue. "To show substantial similarity based on dialogue, a plaintiff must establish 'extended similarity of dialogue.'" *Olson v. NBC*,

855 F.2d 1446, 1450 (9th Cir. 1988). Plaintiff has not identified—nor has the Court uncovered—any dialogue in the Allende Novel and the Cabell Musical that meets this bar. Accordingly, no reasonable juror could find that the dialogue is substantially similar.

Finally, there is no substantial similarity among pace, mood, or tone. The Allende Novel has a sort of a romantic, wistful tone, and its narrator has a dignified air to his voice. *See, e.g*., Allende Novel 167 ("I take no pleasure in prying into others' intimate moments."). The Cabell Musical, in contrast, has a more direct, matter-of-fact tone, and its gypsy narrators have a playful demeanor. *See generally* 1996 Cabell Script; 2000/ACE Cabell Script. In addition, the Cabell Musical develops much more quickly than the Allende Novel. For example, Diego and Carlotta fall in and out of love in mere pages. *See, e.g*., 1996 Cabell Script 29-41. Accordingly, no reasonable juror could find that the pace, mood, or tone is substantially similar.

Putting all these observations together, no reasonable juror could find that there is substantial similarity between the Allende Novel and the Cabell Musical. Combining this with the insubstantial evidence of access discussed above (which in turn requires a higher degree of similarity), no reasonable juror could conclude that there is circumstantial evidence of copying. As such, there is no material dispute that the Allende Novel does not infringe Plaintiff's copyrights. Defendants' motion for summary judgment that it does not infringe is GRANTED as to the Allende Novel.

### 2. ZPI Musical

Turning to the ZPI Musical, Defendants contend here too that many of the constituent elements of the Cabell Musical mirror the Public Domain Works and are not protected. Cross-Mot. 23-24. Defendants also contend that, to the extent the Cabell Musical does contain protected work, they differ vastly from the ZPI. *Id*. Plaintiff disagrees on both accounts. After reviewing the Cabell Musical and the relevant scripts of the ZPI Musical, the Court agrees with Plaintiff.

First, a reasonable juror could find that the plot of the ZPI Musical is substantially similar to the plot of the Cabell Musical. Unlike the Allende Novel, the ZPI Musical focuses more on the

adventures of a mature Zorro in Spanish California, which is similar to the focus of the Cabell Musical. As such, more similarities among the plots exist. For example, as Plaintiff points out in his supplemental briefing, both the Cabell Musical and the ZPI Scripts feature a female tavernkeeper who flirts with and seduces the sergeant. *Compare, e.g.*, 2000/ACE Cabell Script at 56-59, *with* ZPI 2008 Script at 62-67. To be sure, there are also similarities between the Cabell Musical and the ZPI Scripts also appear in the Public Domain Works and thus, are not protectable. There are also a number of differences between the Cabell Scripts and the ZPI Scripts. *See* Cross-Mot. 23 (listing potential differences). Nevertheless, this is at least enough to create a triable issue of fact as to whether the plot of the ZPI Musical is substantially similar to the plot of the Cabell Musical.

Second, a reasonable juror could find that certain characters of the ZPI Musical are substantially similar to the characters of the Cabell Musical. For example, both the ZPI Musical and the Cabell Musical contain a female innkeeper character (Inez/Maria) who develops an emotional connection with the Sergeant. As another example, both the ZPI Musical and the Cabell Scripts feature a young Diego and young Carlotta/Luisa, who is a tomboyish girl who plays swords with Diego. As Defendants point out, there are a number of differences between how these characters are portrayed in each of the musicals. *See* Dkt. No. 216-1 at 1-2. Nevertheless, there is at least enough similarity to raise a triable issue of fact as to whether the characters of the ZPI Musical are substantially similar to the characters of the Cabell Musical.

Third, a reasonable juror could find that the settings of the ZPI Musical and the Cabell Musical are substantially similar. For example, both open with a crowd of gypsies who narrate the story of Zorro. *Compare, e.g.*, 1996 Cabell Script at 1, *with* ZPI 2008 Script at 4. As Defendants correctly argue, a "play within a play" format in and of itself is not protectable—this is a stock literary device that has been around since at least Shakespeare.[11] Nevertheless, the more specific

---

[11] Plaintiff also concedes this point. Pl's Opp/Reply 10.

setting of gypsies telling the story of Zorro is not a stock literary device and, as such, illustrates that there is a triable issue of fact as to whether the settings of the ZPI Musical are substantially similar to the settings of the Cabell Musical.

Finally, a reasonable juror could find that the themes of the ZPI Musical and the Cabell Musical are substantially similar. For example, because their plots more similarly focus on the adventures of a mature Zorro, both have themes which have some relation to "good conquers evil." This at least suggests that there is a triable question of fact as whether the themes of the ZPI Musical are substantially similar to the themes of the Cabell Musical.

Putting all these observations together, there is at least a triable question of fact as to whether there is substantial similarity between the ZPI Musical and the Cabell Musical. Combining this with the stronger evidence of access discussed above, a reasonable juror could conclude that there is circumstantial evidence of copying. As such, material disputes remain as to whether Defendants infringe Plaintiff's copyrights. Defendants' motion for summary judgment that it does not infringe is DENIED as to the ZPI Musical and Copyright Nos. PA 2-113-089 and PA 2-171-672.

### b. Striking Similarity (PA 2-2226-359, SR 389-305, PA 10-000-842)

A plaintiff can prove copying even without proof of access "if he can show that the two works are not only substantially similar, but are so strikingly similar as to preclude the possibility of independent creation." *Meta-Film Assoc., Inc. v. MCA Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984) (citing 3 Nimmer on Copyright § 13.01[B] and *Ferguson v. Nat'l Broadcasting Co., Inc.*, 584 F.2d 111, 113 (5th Cir. 1978)). This rule only applies, however, where the works are so unmistakably similar that, "as a matter of logic, the only explanation [for the similarities] between the two works must be 'copying rather than . . . coincidence, independent creation, or prior common source.'" 4-13 Nimmer on Copyright § 13.02[B] (2009) (citations omitted).

Here, there can be no material dispute that the Cabell Musical is not strikingly similar to the Allende Novel because, as discussed above in Section III.A.ii.a.1, the two are not substantially

similar.

There can also be no material dispute that Cabell Musical is not strikingly similar to the ZPI Musical. As Defendants point out in their supplemental briefing, Dkt. No. 216-1, there are a number of differences between the two: For example, even though both contain a female innkeeper character (Inez/Maria), there are differences—Cabell's Maria drunkenly flirts with the Sergeant and never transforms his character; Inez, on the other hand, successfully encourages the Sergeant to become a better man by assisting Zorro in the end. *Compare, e.g.*, 2000/ACE Cabell Script at 121-22, *with* ZPI 2008 Script at 71. As another example, in the Cabell Musical, Diego is a good student who contentiously learns sword fighting from his grandfather; in the ZPI Musical, Diego is a renegade who drops out of the academy and learns swordsmanship and magic from gypsies. *Compare, e.g.*, 2000/ACE Cabell Script at 6-11, *with* ZPI 2013 Script at 2-6. Such differences are sufficient to confirm, as a matter of law, that the Cabell Musical is not strikingly similar to the ZPI Musical.

Accordingly, because there is no evidence of access for Copyright Nos. PA 2-2226-359, SR 389-305, and PA 10-000-842 and the Cabell Musical is not strikingly similar to the Accused Works, there is no circumstantial evidence of copying. As such, Defendants do not infringe these copyrights. Defendants' motion for summary judgment that it does not infringe is GRANTED as to Copyright Nos. PA 2-2226-359, SR 389-305, and PA 10-000-842.

**B. Second Claim: Declaratory Judgment of Non-Infringement by Plaintiff**

**iii. Lack of Justiciable Case or Controversy**

A federal district court may render a declaratory judgment pursuant to the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, where an "actual controversy" exists. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-41 (1937). This "actual controversy" requirement is "coextensive with the 'case or controversy' requirement of Article III of the United States Constitution." *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1075 (N.D. Cal. 2007). A plaintiff may therefore bring an action for declaratory relief "once the adverse positions [of the parties] have

crystallized and the conflict of interests is real and immediate." *Id*. (internal quotations omitted); *see also MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (holding that the relevant question in determining whether issuance of a declaratory judgment is warranted "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality . . .") (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

In the Ninth Circuit, a plaintiff seeking declaratory judgment must show (1) a "real and reasonable" apprehension that he will be subject to liability if he continues to produce the work at issue; and (2) that the apprehension was "caused by the defendant's actions. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1556 (9th Cir. 1989) (citing *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 944 (9th Cir. 1981) and *International Harvester Co. v. Deere & Co*., 623 F.2d 1207, 1211 (7th Cir. 1980)). Courts should apply these principles "with a flexibility that is oriented to the reasonable perceptions of the plaintiff." *See Chesebrough-Pond's, Inc. v. Faberge, Inc*., 666 F.2d 393, 396 (9th Cir. 1982). "A plaintiff does not have to begin distribution of the potentially infringing product in order to have a controversy ripe for declaratory judgment adjudication, so long as the plaintiff has completed all preparatory work." *Shloss*, 515 F. Supp. 2d 106 at 1078 (citing *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 966 (10th Cir. 1996)).

Here, Defendants argue that there is no material dispute that there is no justiciable controversy over whether the Cabell Musical infringes Defendants' copyrights in the U.S. Cross-Mot. 22-23. Defendants acknowledge that there is currently an ongoing copyright dispute in Germany, but argue that, since copyright law is territorial, that has no relevance here. *Id*. at 23. As to the U.S., Defendants point out that they have undertaken no efforts to interfere with any productions of the Cabell Musical in the U.S. for over 15 years, and Plaintiff has not undertaken any efforts—i.e., "completed all preparatory work"—to stage such productions. *Id*.

Plaintiff, on the other hand, argues that he has "completed all preparatory work" because

he has a completed script of the Cabell Musical, the Cabell Musical has already been performed in the U.S. and Germany, and there is record evidence that it would currently be performed in the U.S. but for alleged threats of suit from the ZPI Defendants. Mot. 9. As support, Plaintiff cites to the declarations from Mr. Sordalet and himself, which attest that, in 2013, he attempted to negotiate the production of the Cabell Musical at several theatres in the U.S., but, because of threats from the ZPI Defendants, Plaintiff's agent, Gallissas, refused to license the Cabell Musical. Sordalet Decl. ¶¶ 12-13; Cabell Decl. ¶¶ 16-18.

The Court agrees with Plaintiff. As the Court observed when considering this issue at the motion to dismiss stage, Defendants' position is not compelling in light of the parties' contentious history, as well as evidence that Defendants threatened Plaintiff and other third parties with litigation if they produced the Cabell Musical. *See, e.g.*, Sordalet Decl. ¶ 14 ("John Gertz made it clear to Mr. Cabell and his agent, Gallissas, that despite the rulings in Germany, he would continue to sue any theatre that produced Mr. Cabell's musical."); Cabell Decl. ¶ 16 ("John Gertz and ZPI continued to threaten Gallissas and any theatre willing to produce my musical."). Plaintiff currently has completed script(s) which he stands ready produce. If he continues in these efforts, it seems likely that Defendants will continue to threaten suit. Plaintiff need not have a theater rented out and a cast of characters waiting in the back in order to confirm this. Even without this, "the conflict of interests is real and immediate." Accordingly, Plaintiff's claim cannot be defeated for lack of a justiciable controversy.

### iv. Statute of Limitations

The statute of limitations bars copyright claims that are not "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). "A claim ordinarily accrues 'when [a] plaintiff has a complete and present cause of action.'" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969, 188 L. Ed. 2d 979 (2014) (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118 S. Ct. 542, 139 L. Ed. 2d 553 (1997)). "For ordinary claims of copyright infringement, each new infringing act causes a new claim to

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

27

accrue." *Seven Sills* (citing *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481-82 (9th Cir.1994)). "By contrast, . . . 'claims of co-ownership, as distinct from claims of infringement,' accrue only once, 'when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation.'" *Id.* (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996)).

Courts have applied the statute of limitations to declaratory judgment claims. *See, e.g.*, *Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996), as amended (June 14, 1996) (declaratory judgment claim for co-ownership barred by statute of limitations); *Merch. v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996) (same). However, at the same time, the statute of limitations does not bar affirmative defenses. *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003) ("A defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations.") (citing *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 72, 77 S. Ct. 161, 1 L. Ed. 2d 126 (1956)).

Here, it is undisputed that, "[i]n 1997, [Defendants] expressly and unequivocally repudiated [Plaintiff's] claims that he could produce his musical without infringing ZPI's rights." Dkt. No. 206-11 at 10-11. Defendants argue that because Plaintiff waited until 2013 to seek a declaration that "his musical does not infringe upon any copyright or trademark interest of ZPI"— well over three years since their 1997 "repudiation"—the statute of limitations bars Plaintiff's claim. Defs' Cross-Mot. 19-20. Plaintiff, on the other hand, argues that the statute of limitations does not bar his declaratory judgment claim because he "submit[s] [it] as a defense to Defendants yet-to-be asserted copyright infringement claims." Pl.'s Reply at 6.

Defendants are correct that the statute of limitations can apply to a claim for declaratory relief. As the Ninth Circuit has directed, the analysis must focus on the substance of the underlying claim; where the statute of limitations would bar a claim brought for affirmative relief (e.g., a claim for infringement brought by a copyright holder), it would also bar a declaratory judgment claim that effectively seeks the same result (e.g., a claim for declaratory judgment of

non-infringement brought by an alleged infringer). *See Levald, Inc v. City of Palm Desert*, 998 F. 2d 680, 688 (9th Cir. 1993) ("To prevent plaintiffs from making a mockery of the statute of limitations by the simple expedient of creative labelling - styling an action as one for declaratory relief rather than for damages - courts must necessarily focus upon the substance of an asserted claim as opposed to its form. It is settled, therefore, that where legal and equitable claims coexist, equitable remedies will be withheld if an applicable statute of limitations bars the concurrent legal remedy."); *see also Luckenbach S. S. Co. v. United States*, 312 F.2d 545, 549 (2d Cir. 1963) ("For purposes of the statute of limitations non-liability is inextricably linked with that cause of action. So long as the claim can be made, its negative can be asserted. When the claim itself has been barred, a declaration of non-liability is also barred, except for non-liability which is itself based upon the bar of the limitations period.").

Here, however, the declaratory relief that Plaintiff seeks is a declaration that "his musical does not infringe upon any copyright or trademark interest of ZPI"—i.e., if Plaintiff were to produce his musical tomorrow, it would not infringe Defendants' intellectual property. If Plaintiff were to produce his musical tomorrow, the statute of limitations would not bar an infringement claim by Defendants. Accordingly, the statute of limitations also cannot bar the declaration that Plaintiff seeks.

### v. Laches

"In order to succeed on a defense of laches, a defendant must prove both: (1) an unreasonable delay by plaintiff in bringing suit, and (2) prejudice to himself." *Miller v. Glenn Miller Prods., Inc*., 454 F.3d 975, 997 (9th Cir. 2006).

"Laches is a defense developed by courts of equity." *Petrella*, 134 S. Ct. at 1973. As such, the Supreme Court "has cautioned against invoking laches to bar legal relief." *Id*. For this reason, the Supreme Court determined in *Petrella* that laches was not available as a defense to a claim of copyright infringement under 504(b). *Id*. at 1975.

Defendants argue that laches bars Plaintiff's claim for declaratory relief because the

disputes over whether the Cabell Musical potentially infringed Defendants' rights came to a head in 1997, but Plaintiff unreasonably waited until 2013 to seek declaratory relief.  Cross-Mot. 21. All the while, Defendants argue, Defendants invested millions of dollars in developing the ZPI Musical.  *Id*.  In addition, evidence was lost and memories faded.  *Id*.

Plaintiff responds that laches does not apply here because, under *Petrella*, laches does not apply to remedies at law, which include copyright infringement.  Pl.'s Opp/Reply 6-7.  Defendants do not disagree that laches is an equitable remedy, but argue that, because declaratory relief *is* an equitable remedy, laches can be invoked here.  Defs' Reply at 12-13.

Plaintiff is correct that *Petrella* held that copyright claims are remedies at law and, as such, cannot be barred by laches.  The question then becomes whether this result changes when copyright issues are adjudicated as part of a declaratory judgment claim.  Although the Ninth Circuit has not squarely decided this issue, the Court concludes that laches also cannot apply to Plaintiff's declaratory judgment claim.  "A particular declaratory judgment draws its equitable or legal substance from the nature of the underlying controversy."  *Transamerica Occidental Life Ins. Co. v. Digregorio*, 811 F. 2d 1249, 1251 (9th Cir. 1987).  Applied here, this suggests that Plaintiff's claim for declaratory relief is legal (not equitable) in nature.  As such, laches cannot apply.

### vi.    Merits

To prevail in a claim for copyright infringement, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns*, 499 U.S. at 361.

In his original motion, Plaintiff argued that he is entitled to summary judgment of non-infringement because his musical is just a composition of elements from the public domain, it does not infringe.  Mot. 11-13.  Defendants did not respond to these arguments.  *See* Cross-Mot.  The Ninth Circuit has "held that a plaintiff has 'abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment.'"  *Shakur v. Schriro*, 514 F.3d 878, 892 (9th

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Cir. 2008) (quoting *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)). Accordingly, the Court deems Defendants to have abandoned the position that Plaintiff does not infringe its copyrights on the merits.[12] For this reason, Plaintiff's motion for summary judgment of non-infringement is GRANTED.

## IV. ORDER

For the foregoing reasons:

1. Plaintiff's motion for partial summary judgment (Dkt. No. 185) that he does not infringe Defendants' copyrights is GRANTED;

2. Defendants' cross-motion for partial summary judgment (Dkt. No. 195) that they do not infringe Plaintiff's copyrights is GRANTED as to infringement of Copyright Nos. PA 2-2226-359, SR 389-305, PA 10-000-842; GRANTED as to infringement of Copyright Nos. PA 2-113-089 and PA 2-171-672 by the Allende Novel; and DENIED as to infringement of Copyright Nos. PA 2-113-089 and PA 2-171-672 by the ZPI Musical.

**IT IS SO ORDERED.**

Dated: May 11, 2018

_____
EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

---

[12] The Court also notes that, because Defendants did not counterclaim for infringement, it may be that they have forever abandoned their ability to bring these claims. *See* Fed. R. Civ. P. 13(a)(1); *see also Touchpoint Commc'ns, LLC v. Dentalfone, LLC*, No. 3:15-CV-05240-JRC, 2016 WL 524260, at *5 (W.D. Wash. Feb. 10, 2016) (parties did not dispute and court agreed that "a counterclaim for copyright infringement is a compulsory counterclaim"); *cf. Polymer Industrial Products Co. v. Bridgestone/Firestone, Inc.*, 347 F.3d 935, 938 (Fed. Cir. 2003) (holding in the patent context that "Rule 13(a) makes an infringement counterclaim to a declaratory judgment action for noninfringement compulsory").

Case No.: 5:15-cv-00771-EJD
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT